O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KOBE FALCO, individually,      ) Case No. CV 13-00686 DDP (MANx)
and on behalf of a class       )
similarly situated             ) **ORDER DENYING DEFENDANT'S MOTIONS**
individuals,                   ) **TO DISMISS UNDER RULES 12(b)(2)**
                               ) **AND 12(b)(6)**
                 Plaintiff,    )
                               ) [Dkt. Nos. 99, 100]
        v.                     )
                               )
NISSAN NORTH AMERICA INC.,     )
NISSAN MOTOR CO.LTD, a         )
Japanese Company,              )
                               )
                 Defendants.   )
_____)

     Presently before the Court are two Motions to Dismiss the

Second Amended Complaint as to Nissan Motor Co. Ltd ("NML"), one

for lack of personal jurisdiction and one for failure to state a

claim.  (Dkt. Nos. 99, 100.)  Having heard oral arguments and

considered the parties' submissions, the Court adopts the following

order.

**I.    BACKGROUND**

     The Court has already set out the background facts of this

case in its order of October 10, 2013, and they remain largely the

same.  Briefly, the named Plaintiffs purchased four Nissan vehicles between 2005 and 2007 that shared in common a particular kind of timing chain system, which they allege was prone to failure and put consumers at risk.  Falco v. Nissan N. Am. Inc., No. CV 13-00686 DDP MANX, 2013 WL 5575065, at *1-2 (C.D. Cal. Oct. 10, 2013).  They bring this action under various California and Washington consumer protection statutes on behalf of themselves and others similar situated.  (Second Amended Complaint ("SAC") at 1.)

NML is the parent company of Nissan North America ("NNA"), which sells Nissan products in the United States.  (Id. at ¶ 21.) NML was a Defendant in the original state complaint in this case. (Dkt. No. 1.)  After NML filed a motion asserting that the Court lacked jurisdiction over it, (Dkt. No. 27), the Court ordered limited discovery to establish the jurisdictional facts.  (Dkt. No. 65.)  While that discovery was under way, the Supreme Court issued its opinion in Daimler AG v. Bauman, 134 S. Ct. 746 (2014).  NML argued Bauman foreclosed any possibility of general jurisdiction. (Dkt. No. 78.)  The parties therefore stipulated to dismiss NML as a defendant, but with leave for Plaintiffs to re-add NML in a future amended complaint.  (Dkt. Nos. 83, 86.)  A few months later, Plaintiffs filed the SAC, which did add NML back as a defendant. (Dkt. No. 90.)  The present motions followed.

**II.  LEGAL STANDARD**

**A.   Personal Jurisdiction**

A court in a given "forum state" may exercise specific personal jurisdiction over a non-resident defendant if the following conditions are met:

1      (1) The non-resident defendant must purposefully direct his

2      activities or consummate some transaction with the forum or

3      resident thereof; or perform some act by which he purposefully

4      avails himself of the privilege of conducting activities in

5      the forum, thereby invoking the benefits and protections of

6      its laws;

7      (2) the claim must be one which arises out of or relates to

8      the defendant's forum-related activities; and

9      (3) the exercise of jurisdiction must comport with fair play

10      and substantial justice, i.e. it must be reasonable.

11 _Schwarzenegger v. Fred Martin Motor Co._, 374 F.3d 797, 802 (9th

12 Cir.2004). A plaintiff bears the burden of establishing the first

13 two prongs; the burden then shifts to the defendant to show that

14 the exercise of jurisdiction would be unreasonable. _Id._

15 **B.   Motions to Dismiss**

16     A complaint will survive a motion to dismiss when it contains

17 "sufficient factual matter, accepted as true, to state a claim to

18 relief that is plausible on its face." _Ashcroft v. Iqbal_, 556 U.S.

19 662, 678 (2009) (quoting _Bell Atl. Corp. v. Twombly_, 550 U.S. 544,

20 570 (2007)). When considering a Rule 12(b)(6) motion, a court must

21 "accept as true all allegations of material fact and must construe

22 those facts in the light most favorable to the plaintiff." _Resnick_

23 _v. Hayes_, 213 F.3d 443, 447 (9th Cir.2000). "When there are

24 well-pleaded factual allegations, a court should assume their

25 veracity and then determine whether they plausibly give rise to an

26 entitlement of relief." _Iqbal_, 556 U.S. at 679. "Determining

27 whether a complaint states a plausible claim for relief" is a

28 "context-specific task that requires the reviewing court to draw on

its judicial experience and common sense." Id. A complaint need
not include "detailed factual allegations," but it must offer "more
than an unadorned, the-defendant-unlawfully-harmed-me accusation."
Id. at 678. Statements of legal conclusions "are not entitled to
the assumption of truth." Id. at 679.

**C.   Rule 9(b)**

Claims sounding in fraud are subject to the heightened
pleading requirements of Federal Rule of Civil Procedure 9(b),
which requires that a plaintiff alleging fraud "must state with
particularity the circumstances constituting fraud." "To satisfy
Rule 9(b), a pleading must identify the who, what, when, where, and
how of the misconduct charged, as well as what is false or
misleading about [the purportedly fraudulent] statement, and why it
is false." Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047,
1055 (9th Cir.2011) (internal quotation marks and citations
omitted).

**III. DISCUSSION**

**A.   Personal Jurisdiction over NML**

Plaintiffs, having conducted limited discovery against NML as
to jurisdiction, have filed the SAC adding NML back in as a
Defendant in this action. Plaintiffs proceed under a theory of
specific jurisdiction, because, as the parties appear to agree,[1]
NML was intimately involved with the design and testing of the
timing chain system at issue. NML argues that there is no specific
jurisdiction, because it *only* participated in design choices and

---

[1]See Reply ISO Mot. Dismiss Rule 12(b)(2) at 1:7-9 (NML has
"never denied" that it "had design 'release responsibility' for the
design of the vehicles").

1   "never manufactured, distributed, sold, or warranted" any of the

2   vehicles in question.  (Reply ISO Mot. Dismiss Rule 12(b)(2) at

3   1:10-11.)  Defendant argues that the "stream of commerce" theory of

4   personal jurisdiction on which Plaintiff relies only applies to an

5   entity that "actually *placed* the product into the stream of

6   commerce."  (Id. at 3:1-2.)

7        At the outset, the Court notes that Plaintiffs do not concede

8   that all physical fabrication was done solely by NNA.  (Opp'n at

9   20, n.4.)  But even if it was, that does not foreclose a finding

10  that NML "manufactured" the vehicles and components in question.

11  Design is a critical portion of the manufacturing process; without

12  design, there is simply nothing to manufacture.  Indeed, the

13  defining characteristic of a manufactured good is the imposition of

14  a man-made pattern, form, or design onto raw materials.[2]  NML's

15  attempt to separate its control over the design and testing phases

16  of manufacturing from the physical act of fabricating the vehicles,

17  and to insist that only the latter qualifies as "manufacturing" or

18  "putting a product into the stream of commerce," is therefore

19  unconvincing – at least on these facts.  This is not, for example,

20  a case where a wholly independent designer sells a product design

21

---

22       [2]Black's Law Dictionary 1109 (10th ed. 2014) (defining a
    "manufacture" as "any material form produced . . . from an unshaped
23   composition of matter").  A district court in Kansas, confronted
    with a case in which a foreign company had provided the design for
24   a motorcycle built by a sibling U.S. company, held that it had
    personal jurisdiction because "Honda R & D's *design* was a product .
25   . . .  Honda R & D's design may be likened to a *component* of the
    Honda motorcycle; in fact, it is a component which controls all
26   other components." Wessinger v. Vetter Corp., 685 F. Supp. 769,
    777 (D. Kan. 1987) (emphases added).  The Court need not adopt the
27   holding of Wessinger to resolve this case, but that holding does
    provide one metaphor for thinking about the key role of design in
28   manufacturing.

1  to another company and is completely uninvolved in the production
2  of the physical product thereafter.[3]  Rather, Plaintiff's evidence
3  shows that NML took almost total responsibility for the relevant
4  components up through the initial production release,[4] NML
5  conducted testing of the components,[5] NML had authority over the
6  manufacturing process, because parts and vehicles could not be
7  manufactured without NML's "release,"[6] NML appears to have been
8  involved in monitoring the manufacturing plant,[7] and NML had the
9  final authority to change or decline to change the manufacture of
10 faulty parts, including for pricing reasons.[8]  NML has produced no
11 evidence to the contrary on any of these points.
12      Thus, the Court finds that NML, at the very least,
13 participated in manufacturing the vehicles in question (and
14 possibly warranting them as well), and has therefore placed them
15 into the stream of commerce.

_____

17    [3]See, e.g., Lyons v. Rienzi & Sons, Inc., 856 F. Supp. 2d 501,
18 506, 510 (E.D.N.Y. 2012) (declining to find specific jurisdiction
   over Italian company that sold its yacht design to an unrelated
   Wisconsin firm for $30,000 and had no further hand in the process).

19    [4]Decl. Mark Pifko, Ex. 1 at transcript page 54.

20    [5]Pifko Decl., Ex. 1 at transcript page 56.

21    [6]Pifko Decl., Ex. 1 at transcript pages 25-26 (NML was the
22 entity that gave "approval to use [particular] parts on an engine
   or a vehicle").

23    [7]Pifko Decl., Ex. 1 at transcript page 27.

24    [8]Pifko Decl., Ex. 2 (NML had authority to reject a proposed
25 "countermeasure" in 2003); Id., Ex. 5 at transcript page 140
   (same); Id., Ex. 7 (manufacturing change proposed by NNA and third-
26 party contractor, but NML "resisted" and the change was not
   adopted); Ex. 5 at transcript pages 81-82 (NNA's design team
27 did not have "budgetary responsibility" for the components in
   question because they didn't have "design responsibility," while
28 NML did have design responsibility and took into account the impact
   of design changes on the budgeted "piece price").

1    That would not matter, of course, if NML had not aimed its

2    efforts at the California market.  See, e.g., J. McIntyre Mach.,

3    Ltd. v. Nicastro, 131 S. Ct. 2780, 2790, 180 L. Ed. 2d 765 (2011)

4    (Kennedy, J., plurality opinion) (no jurisdiction because

5    "[r]espondent has not established that J. McIntyre engaged in

6    conduct purposefully directed at" the forum state).  "The placement

7    of a product into the stream of commerce, without more, is not an

8    act purposefully directed toward a forum state."  Holland America

9    v. Wärtsilä North America, Inc., 485 F.3d 450, 459 (9th Cir.2007).

10   In this case, however, the Court concludes that this requirement is

11   satisfied, because NML "purposely direct[ed]" its activities at the

12   forum state.  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d

13   797, 802 (9th Cir.2004).

14   NML appears to have used NNA as a "distributor who has agreed

15   to serve as the sales agent in the forum State" for the vehicles

16   that NML helped to manufacture.  Asahi Metal Indus. Co. v. Superior

17   Court of California, Solano Cnty., 480 U.S. 102, 112 (1987)

18   (O'Connor, J., plurality opinion).  According to deposition

19   testimony, NML intends for the components at issue to be sold in

20   California.  (Decl. Mark Pifko, Ex. 5 at transcript pages 35-36.)

21   NNA is "the sole authorized distributor of Nissan and Infiniti

22   vehicles in the United States, including California."  (Dkt. No.

23   27-1, Decl. Shiho Kobayashi, ¶ 17.)  And that distribution

24   relationship is not simply a hands-off parent-subsidiary

25   relationship.  Half the members of NNA's Board of Directors also

26   sit on NML's Board of Directors.  (Dkt. No. 27-1, Decl. Shiho

27   Kobayashi, ¶ 13-14.)  Plaintiffs allege, and NML does not deny,

28   that NML and NNA worked closely together on "the distribution,

sale, lease, servicing, and warranting of the Subject Nissan Vehicles." (SAC, ¶ 23.) NML appears to engage in direct advertising aimed at the American market, including California, for at least some of the vehicles at issue—which are necessarily distributed by NNA. (Dkt. No. 40-3.) NML also puts out press releases touting the activities of NNA (often referred to simply as "Nissan") in the United States, including in California. (Decl. Mark Pifko, Exs. 10-11.) Taken as a whole, the evidence shows "additional conduct" that "indicate[s] an intent or purpose to serve the market in the forum State." Asahi, 480 U.S. 102, 112 (1987).[9]

The rest of the elements of specific jurisdiction follow naturally. Because NML was involved in and had authority over the manufacturing process, used NNA as its distribution agent, and appears to have taken part in the marketing of the vehicles, with the intent of selling them in California, Plaintiffs' claims under various consumer protection statutes arise out of and/or relate to NML's forum-related activities. Schwarzenegger, 374 F.3d at 802.

Finally, given all the above, NML has not shown that it would be unreasonable for the Court to exercise jurisdiction. In the Ninth Circuit, "[t]he court examines seven factors to determine reasonableness: [1] the extent of purposeful interjection; [2] the burden on the defendant; [3] the extent of conflict with sovereignty of the defendant's state; [4] the forum state's

---

[9]See also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) ("[I]f the sale of a product . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in [the forum state], it is not unreasonable to subject it to suit [there] . . . .").

1  interest in adjudicating the suit; [5] the most efficient judicial
2  resolution of the dispute; [6] the convenience and effectiveness of
3  relief for the plaintiff; and [7] the existence of an alternative
4  forum." Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1198-99
5  (9th Cir. 1988).

6      The first factor is closely tied with the purposeful direction
7  analysis. Sinatra v. Nat'l Enquirer, Inc., 854 F.2d at 1199.
8  Nonetheless, [e]ven if there is sufficient 'interjection' into the
9  state to satisfy the purposeful availment prong, the degree of
10  interjection is a factor to be weighed in assessing the overall
11  reasonableness of jurisdiction . . . ." Core-Vent Corp. v. Nobel
12  Indus. AB, 11 F.3d 1482, 1488 (9th Cir. 1993). Here, although the
13  purposeful interjection is present, it does not appear to be
14  particularly strong; NML does not, for example, have offices or
15  other physical presence in the forum state. This factor tilts
16  against reasonableness.

17      The second factor is something of a wash with the sixth,
18  because convenience for the defendant will usually result in
19  inconvenience for the plaintiff. Thus, this factor is usually more
20  relevant to change of venue analysis than jurisdictional analysis.
21  Shute v. Carnival Cruise Lines, 897 F.2d 377, 386-87 (9th Cir.
22  1990) rev'd as to other matters sub nom. Carnival Cruise Lines,
23  Inc. v. Shute, 499 U.S. 585 (1991). The sixth factor is similarly
24  given little weight, although some courts have distinguished
25  between corporate and individual plaintiffs, as the latter do not
26  necessarily have the "considerable resources" that would be needed
27  to "litigate elsewhere." Metro-Goldwyn-Mayer Studios Inc. v.
28  Grokster, Ltd., 243 F. Supp. 2d 1073, 1094 (C.D. Cal. 2003).

1    Overall, these factors are neutral or tilt slightly in favor or

2    reasonableness.

3         As to the third factor, the Court does not lightly consider

4    exercising jurisdiction over a foreign corporation.  "Great care

5    and reserve should be exercised when extending our notions of

6    personal jurisdiction into the international field." Asahi, 480

7    U.S. at 115.  On the other hand, where, as here, the foreign entity

8    exerts significant control over the manufacturing operations of a

9    U.S. subsidiary and takes active steps to do business in the forum

10   state, concerns about conflicts of sovereignty are reduced, because

11   the foreign entity has volunteered to be subject to (as well as to

12   benefit from) the laws of the forum state.[10]

13        The fourth factor strongly favors reasonableness.  California

14   has a significant interest in having the dispute resolved, because

15   most of Plaintiffs' claims arise under California laws designed to

16   protect California consumers from unfair business practices.[11]

17   _____

18   [10]NML points to the Supreme Court's recent call for U.S.
     courts to consider "international comity" and the theories of
19   jurisdiction applied by other countries when deciding whether to
     assert jurisdiction. Daimler AG v. Bauman, 134 S. Ct. 746, 763
20   (2014).  However, NML identifies no particular Japanese notion of
     jurisdiction, nor any particular "consideration[] of international
21   rapport," that counsels against exercising jurisdiction. Id.

22   [11]Defendants argue that the California consumer protection
     statutes – the Consumers Legal Remedies Act ("CLRA"), Unfair
23   Competition Law ("UCL"), and Song-Beverly Consumer Warranty Act
     ("Song") – only apply to those with whom potential plaintiffs have
24   had a direct transaction – essentially, the final seller.  But that
     is not true – the California statutes allow manufacturer liability
25   even if the manufacturer is not the retail seller. See Cal. Civ.
     Code § 1792 ("[E]very sale of consumer goods that are sold at
26   retail in this state shall be accompanied by the manufacturer's and
     the retail seller's implied warranty that the goods are
27   merchantable.") (emphasis added); Delarosa v. Boiron, Inc., 275
     F.R.D. 582, 588 (C.D. Cal. 2011) (plaintiff could establish
28   numerosity in class action against drug manufacturer under the CLRA
                                                    (continued...)

1    Finally, efficiency of resolution and the existence of
2  alternative fora are in this case linked.  NML proposes no
3  alternative forum in which this case could be heard, but on NML's
4  theory that it is not subject to American jurisdiction at all,
5  presumably Plaintiffs could only seek justice in a Japanese court.
6  It is not clear that there exists a Japanese court that would
7  enforce California consumer protection laws, but even if there
8  were, both the Plaintiffs and NNA would be massively hindered in
9  presenting their cases, as the witnesses and physical evidence in
10 this case are likely to be located primarily in the United States.
11 These factors also support a finding of reasonableness.

12    Taken as a whole, the factors weigh in favor of finding that
13 the exercise of personal jurisdiction over NML is reasonable in
14 this case.

15    For all of the above reasons, the Court finds that it has
16 personal jurisdiction over NML.

17 **B.   Rule 8 Pleading**

18    NML alleges that Plaintiffs have not adequately stated a claim
19 against it because the SAC frequently "fail[s] to differentiate
20 between [NML] and NNA" and "Plaintiff's claims are against NNA
21 alone."  (Mot. Dismiss Rule 12(b)(6) at 1:10, 1:22.)  The latter
22 point is, of course, the legal conclusion NML wishes to reach and
23 cannot be assumed at this stage in the litigation, when the Court
24 must presume that Plaintiffs' factual allegations are true.  As to
25 the former point, NML argues that because Plaintiffs frequently

26

27         [11](...continued)
28 and UCL by alleging that drug was sold in retail pharmacies around
   the state).  See Part III.C. infra.

11

1  refer to NML and NNA collectively as "Nissan," the SAC lacks

2  specificity.

3       But plaintiffs routinely refer to defendants under some

4  collective name, as it would be tedious to list each defendant

5  separately every time one wished to make an allegation against them

6  all.  And Plaintiffs' SAC spells out in quite a bit of detail what

7  NML or its agents or employees are alleged to have done.  (SAC, ¶¶

8  38-57 (describing NML's role in designing the allegedly faulty

9  system).)  To the degree that the SAC alleges actions taken by

10 "Nissan," the Court reads that as it would any other complaint

11 making allegations against defendants named collectively – either

12 as an allegation that the defendants acted in concert or as a

13 general allegation against all defendants (subject to narrowing

14 after discovery), depending on the context.

15 **C.   Rule 9(b) Pleading**

16      NML also argues that Plaintiffs' pleadings against it are

17 insufficiently specific to satisfy the pleading requirements of

18 Rule 9(b), which states that "[i]n alleging fraud . . . a party

19 must state with particularity the circumstances constituting fraud

20 . . . ."  NML argues that Plaintiffs' claims largely or entirely

21 sound in fraud, and that they therefore must be pled "with

22 particularity" – a phrase the Ninth Circuit has interpreted as

23 meaning, essentially, "the who, what, when, where, and how of the

24 misconduct charged." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097,

25 1106 (9th Cir. 2003) (internal quotation marks omitted).

26 Specifically, NML argues that Rule 9(b) is not satisfied because

27 (1) Plaintiffs' allegations do not adequately distinguish between

28

1    NML and NNA generally and (2) Plaintiffs cannot assert that NML (as
2    distinct from NNA) entered into a "transaction" with them.

3         Although the Causes of Action speak somewhat broadly of
4    actions taken by "Nissan," Plaintiffs' background allegations
5    contain plenty of specifics as to acts NML is alleged to have taken
6    separate from (and even in opposition to) NNA.  In particular, ¶¶
7    49-50 and ¶¶ 52-53 allege that specific officers at NML were aware
8    of alleged flaws in the timing chain in 2003, declined to test a
9    solution because of cost concerns, and "sought to bury the
10   problems."  These are the "who, what, when, where, and how of the
11   misconduct," and they give NML adequate notice of the acts it is
12   alleged to have committed.  Kearns v. Ford Motor Co., 567 F.3d
13   1120, 1124 (9th Cir. 2009) (the purpose of Rule 9(b) is "to give
14   defendants notice of the particular misconduct so that they can
15   defend against the charge") (ellipsis omitted).  To the degree that
16   "sought to bury the problems" is not perfectly precise, it is
17   nonetheless sufficient for Rule 9(b) purposes to indicate that
18   NML's officers undertook to hide reports of the alleged flaw.
19   "[I]n cases of corporate fraud, the plaintiffs cannot be expected
20   to have personal knowledge of the facts constituting the
21   wrongdoing."  Wool v. Tandem Computers Inc., 818 F.2d 1433, 1439
22   (9th Cir. 1987).

23        NML also argues that Plaintiffs cannot show that they have
24   entered into a "transaction" with it, which it claims is required
25   for a claim under the consumer protection statutes.  It is true
26   that a common law fraud claim requires a direct relationship, such
27   as that of a "seller and buyer," between the manufacturer and the
28   plaintiff.  LiMandri v. Judkins, 52 Cal. App. 4th 326, 336-37

                                    13

(1997).  But "[w]hile . . . tort standards at times may be relevant to a court's evaluation of CLRA actions," that does not mean "that CLRA actions must fulfill the same elements as common law fraud claims."  <u>Chamberlan v. Ford Motor Co.</u>, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005).  There are "numerous cases supporting [the] contention that a direct sale is not required to allege a CLRA claim."  <u>Rossi v. Whirlpool Corp.</u>, No. 2:12-CV-00125, 2013 WL 5781673, at *10 (E.D. Cal. Oct. 25, 2013).  "[T]he CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer."  <u>Id.</u> See also <u>McAdams v. Monier, Inc.</u>, 182 Cal. App. 4th 174, 188 (2010) ("A cause of action for unfair competition under the UCL may be established independent of any contractual relationship between the parties.").  The Court concludes that a manufacturer that is not the direct seller may be held liable for failure to disclose material defects under the CLRA and the UCL, although not for common law fraud.[12]

Nonetheless, not just any failure to disclose a defect can support a claim against a manufacturer under the CLRA and UCL. Only when the manufacturer has a specific obligation to disclose the defect can a plaintiff allege actionable fraud under the statutes.  An obligation arises when a defendant manufacturer "had exclusive knowledge of material facts not known to the plaintiff," and/or "actively conceal[ed] a material fact from the plaintiff." <u>Smith v. Ford Motor Co.</u>, 749 F. Supp. 2d 980, 987 (N.D. Cal. 2010)

_____

[12]To the extent that NML's argument rests on the contention that it is not the "manufacturer" of the vehicles or components in question, the Court has already rejected that argument above.

1  aff'd, 462 F. App'x 660 (9th Cir. 2011).  Apart from a warranty

2  obligation, for the fact of a defect to be "material," it must

3  involve a "safety issue."  Id.  Thus, under California law, a

4  manufacturer can be sued under the CLRA and/or the UCL if it had

5  exclusive knowledge of a safety-related defect or if it actively

6  concealed such a defect.

7       Plaintiffs have alleged that the timing chain defect in this

8  case "places the driver and passengers at a risk of harm . . . .

9  What the Timing Chain Tensioning System fails, it can cause . . .

10  the inability to accelerate and maintain speed, as well as

11  catastrophic engine failure . . . . [O]ccupants of the vehicles are

12  exposed to rear end collisions and other accidents . . . ."  (SAC,

13  ¶ 10.)  This allegation, combined with allegations that NML knew of

14  the alleged defect and that it attempted to conceal the defect, are

15  sufficiently particular to allege an obligation to disclose and

16  therefore to state a claim under the statutes.

17       Thus Plaintiffs can assert statutory causes of action against

18  NML, apart from the final sales transaction that they may have

19  entered into with NNA.  The common law fraud claim, however, may be

20  asserted only against NNA – at least on the facts currently pled.

21  **IV.   CONCLUSION**

22       The Court DENIES the motions to dismiss as to all claims

23  except the Fifth Cause of Action (Fraud), which is DISMISSED as to

24  NML.

25

26  IT IS SO ORDERED.

27  Dated: April 6, 2015

28
                                 DEAN D. PREGERSON
                                 United States District Judge